1
2
3
4                          UNITED STATES DISTRICT COURT

5                              DISTRICT OF NEVADA

6                                    * * *

7    THORA D. DONOVAN,                          Case No. 2:14-cv-00790-RFB-PAL

8                            Ms. Donovan,
                                                **REPORT OF FINDINGS AND**
9         v.                                    **RECOMMENDATION**

10   CAROLYN W. COLVIN, Acting
     Commissioner of Social Security,           (Mot. To Remand – Dkt. #18)
11                                              (Cross-Mot. to Affirm – Dkt. #19)

                             Defendant.
12

13          This matter involves Plaintiff Thora D. Donovan's appeal and request for judicial review

14   of the Commissioner of Social Security, Defendant Carolyn W. Colvin's final decision denying

15   her claim for Disability Insurance Benefits under Title II of the Social Security Act (the "Act"),

16   42 U.S.C. §§ 401–433, and claim for Supplemental Security Income under Title XVI of the Act,

17   42 U.S.C. §§ 1381–1383.

18                                      **BACKGROUND**

19   **I.    PROCEDURAL HISTORY**

20          Ms. Donovan alleges disability due to (1) severe osteoporosis; (2) multiple broke bones;

21   (3) panic; (4) anxiety.  AR 161.[1]  On November 15, 2010, Ms. Donovan protectively filed an

22   application for disability insurance benefits alleging she became disabled beginning September

23   19, 2010.  AR 157.  The SSA denied her application initially and on reconsideration.  AR 89–

24   102.  An administrative law judge ("ALJ") held a hearing on November 6, 2012, where Ms.

25   Donovan appeared with counsel.  AR 58–79.

26

27   _____
     [1] AR refers to the Administrative Record, a certified copy of which was delivered to the undersigned upon
28   the Commissioner's filing of an Answer (Dkt. #11).  *See* Notice of Manual Filing (Dkt. #12).

During the hearing, Ms. Donovan's counsel asserted that her case stemmed from the severe pain associated with her osteoporosis as well as her depression and anxiety.   AR 62. Counsel asserted that Ms. Donovan's extreme pain was the result of numerous bone fractures that have left her with great difficulty walking and also limited her ability to sit and stand.   *Id.* Additionally, counsel informed the ALJ that Ms. Donovan's primary care doctor had recently diagnosed her with fibromyalgia and prescribed medication for this condition.   AR 63. However, Ms. Donovan did not have diagnostic testing to support the fibromyalgia diagnosis. *Id.*

In a decision dated November 28, 2012, the ALJ found that Ms. Donovan was not disabled.   AR 29–40.   Ms. Donovan requested review of the ALJ's decision by the Appeals Council, but the ALJ's decision became final when the Appeals Council denied review on March 21, 2014.   AR 1–7.   On May 20, 2014, she filed Complaint (Dkt. #1-1) in federal court, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).   The Commissioner filed her Answer (Dkt. #11) on July 28, 2014.   Ms. Donovan filed a Motion for Reversal and/or Remand (Dkt. #18), and the Commissioner filed an Opposition and Cross-Motion to Affirm (Dkt. #19, #20).   The Court has considered the Motion along with the Opposition and Cross-Motion.   Ms. Donovan did not file a reply brief and the time for doing so has now passed.

## **DISCUSSION**

I.   **APPLICABLE LAW**

A.   **Judicial Review of Disability Determination**

District courts review administrative decisions in social security benefits cases under 42 U.S.C. § 405(g).   *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).   The statute provides that after the Commissioner has held a hearing and rendered a final decision, a disability claimant may seek review of that decision by filing a civil lawsuit in a federal district court in the judicial district where the disability claimant lives.   42 U.S.C. § 405(g).   The statute also provides that the district court may enter, "upon the pleadings and transcripts of the record, a

1    judgment affirming, modifying, or reversing the decision of the Commissioner of Social

2    Security, with or without remanding the cause for a rehearing." *Id.*

3        The Commissioner's findings of fact are conclusive if supported by substantial evidence.

4    42 U.S.C. § 405(g); *Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005). But the Commissioner's

5    findings may be set aside if they are based on legal error or not supported by substantial

6    evidence. *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006); *Thomas v.*

7    *Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). The Ninth Circuit defines substantial evidence as

8    "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a

9    reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d

10   1035, 1039 (9th Cir. 1995); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir.

11   2005). In determining whether the Commissioner's findings are supported by substantial

12   evidence, a court "must consider the entire record as a whole and may not affirm simply by

13   isolating a 'specific quantum of supporting evidence'." *Ghanim v. Colvin*, 763 F.3d 1154, 1160

14   (9th Cir. 2014) (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

15       Under the substantial evidence test, a court must uphold the Commissioner's findings if

16   they are supported by inferences reasonably drawn from the record. *Batson v. Comm'r Soc. Sec.*

17   *Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2003). When the evidence will support more than one

18   rational interpretation, a court must defer to the Commissioner's interpretation. *Burch v.*

19   *Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Consequently, the issue before a court is not

20   whether the Commissioner could reasonably have reached a different conclusion, but whether

21   the final decision is supported by substantial evidence.

22       It is incumbent upon an ALJ to make specific findings so that a court does not speculate

23   as to the basis of the findings when determining if the Commissioner's decision is supported by

24   substantial evidence. *See Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014). Mere cursory

25   findings of fact without explicit statements about what portions of the evidence were accepted or

26   rejected are not sufficient. *Lewin v. Schweiker*, 654 F.2d 631, 634 (9th Cir. 1981). An ALJ's

27   findings should be comprehensive, analytical, and include a statement explaining the "factual

28   foundations on which the ultimate factual conclusions are based." *Id.* *See also Vincent v.*

*Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984) (an ALJ need not discuss all the evidence in the record, but must explain why significant probative evidence has been rejected).

### B.   Disability Evaluation Process

A claimant has the initial burden of proving disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995).  To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant must provide specific medical evidence to support his or her claim of disability.  *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998).  If a claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy.  *See Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (noting that a claimant bears the burden of proof until the final step in the evaluation process).

## II.   THE ALJ'S DECISION

An ALJ follows a five-step sequential evaluation process in determining whether an claimant is disabled.  20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  If at any step an ALJ makes a finding of disability or non-disability, no further evaluation is required.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

Here, the ALJ followed the five-step sequential evaluation process and issued an unfavorable decision on November 28, 2012 (the "Decision").  AR 29–40.  Ms. Donovan does not challenge the ALJ's findings at steps one through three, but asserts legal error at steps four and five.  In particular, Ms. Donovan asserts the ALJ impermissibly found her testimony not credible.

### A.   Step One

The first step of the disability evaluation requires an ALJ to determine whether the claimant is currently engaging in substantial gainful activity ("SGA").  20 C.F.R. §§ 404.1520(b), 416.920(b).  SGA is defined as work activity that is both substantial and gainful; it involves doing significant physical or mental activities, usually for pay or profit.  20 C.F.R.

§§ 404.1572(a)–(b), 416.972(a)–(b).  If the claimant is currently engaging in SGA, then a finding of not disabled is made.  If the claimant is not engaging in SGA, then the analysis proceeds to the second step.

At step one in the Decision, the ALJ found that Ms. Donovan had not engaged in SGA since September 19, 2010, the alleged onset date.  AR 31.

## B.    Step Two

The second step of the disability evaluation addresses whether a claimant has a medically-determinable impairment that is severe or a combination of impairments that significantly limits him or her from performing basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the claimant's ability to work.  20 C.F.R. §§ 404.1521, 416.921; Social Security Rulings ("SSR") 85-28 (Jan. 1, 1985), 96-3p, 61 Fed. Reg. 34468 (July 2, 1996); 96-4p, 61 Fed. Reg. 34488 (July 2, 1996).[2]  If a claimant does not have a severe medically-determinable impairment or combination of impairments, then an ALJ will make a finding that a claimant is not disabled.  If a claimant has a severe medically-determinable impairment or combination of impairments, then an ALJ's analysis proceeds to the third step.

### 1.    Ms. Donovan's Severe Impairments

At step two, the ALJ found that Ms. Donovan had the following severe impairments: (i) osteoporosis; (ii) polyarthritis; (iii) chronic pain syndrome; (iv) status post left foot injury; and (v) status post rib fractures. AR 31.  To reach this conclusion, the ALJ relied upon the treatment and examination records of Bernard Bertolome, M.D. (*see, e.g.*, AR 270–72, 286–91, 414–64) and David Mumford, M.D. (*see, e.g.*, AR 243–48) among others.   Although Ms. Donovan

---

[2] SSRs are the SSA's official interpretations of the Act and its regulations.  *See Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see also* 20 C.F.R. § 402.35(b)(1).  They are entitled to some deference as long as they are consistent with the Act and regulations.  *See Bray*, 554 F. 3d at 1223 (finding ALJ erred in disregarding SSR 85-41).

1    testified at the hearing that she also suffers from fibromyalgia, the ALJ found that fibromyalgia

2    was "not medically determinable, as the record shows no objective diagnosis."  AR 32.

3                    **2.      Ms. Donovan's Non-Severe Mental Impairments**

4            In making his findings at step two in the Decision, the ALJ specifically considered all of

5    Ms. Donovan's medically determinable impairments, including three non-severe mental

6    impairments.  AR 32.  When the SSA evaluates the severity of mental impairments, 20 C.F.R.

7    § 404.1520a requires the use of a "special technique" to evaluate four broad functional areas

8    known as the "Paragraph B Criteria" in Listing 12.00C of the Listing of Impairments set forth at

9    20 C.F.R., Part 404, Subpart P, Appendix 1.  *Id*.  *See also* 20 C.F.R. § 1520a (explaining the

10   psychiatric review technique); SSR 96-8p, 61 Fed. Reg. 34474 (July 2, 1996) (noting that

11   application of the technique is documented on a Psychiatric Review Technique Form).

12           The ALJ determined that Ms. Donovan had three non-severe mental impairments: (i)

13   mood disorder, (ii) pain disorder, and (iii) depressive disorder.  AR 32.  The ALJ found these

14   mental impairments were non-severe because they did not cause more than a minimal limitation

15   on Ms. Donovan's ability to perform basic mental work activities.  *Id*.  The ALJ based his

16   conclusion in part on Ms. Donovan's self-reports that she was able to perform a variety of

17   activities of daily living, including preparing frozen meals, eating, taking medications, washing

18   dishes, doing laundry, grocery shopping, paying bills, managing her finances, although she took

19   breaks due to her pain.  AR 33, 180–95 (Pl.'s Adult Function Report), 238.  He also noted that

20   Ms. Donovan was able to talk on the phone, use public transportation, help with cooking, and

21   attend to her personal case and hygiene activities.  AR 33, 238.

22           The ALJ also relied upon the treatment records of Alison L. Netski, M.D. (*see, e.g.*,

23   AR 339–79), Mark Suhany, M.D. (*see, e.g.*, AR 395–405), and Peter Pinto, M.D. (*see, e.g.*,

24   AR 339–67, 395–410).  According to these psychiatric records, Ms. Donovan was seen for

25   complaints of depression and anxiety beginning in January 2011.  Her treatment notes indicate

26   she was also experiencing "situational stressors such as unemployment, homelessness, and her

27   son being in jail."  AR 32, 379.  A psychiatric evaluation, dated January 3, 2011, states that Ms.

28   Donovan had previously taken antidepressants but had stopped taking them due to adverse side

                                                      6

effects.  *Id*.  She was prescribed Prozac and Xanax for her depression, anxiety, and OCD symptoms, along with Ambien for difficulty sleeping.  AR 379–80.  Within a month, Ms. Donovan reported that her medications were working.  AR 32, 376.  After several more months, she reported that her "mood has improved significantly," AR 360, and her medication had been "extremely beneficial."  AR 358.  Ms. Donovan stated in follow-up appointments that she was experiencing increased mood swings and the efficacy of the medications had decreased; thus, she was prescribed Cymbalta to replace Prozac.  AR 345–46, 348, 351, 410.  She also disclosed new stressors such as living with her mother, appealing a denial of disability benefits, and being unable to afford surgery on her foot.  AR 345, 348.

Despite her new stressors, Ms. Donovan displayed linear and coherent thought process, intact attention, impulse control, and memory during mental status examinations.  *See* AR 33, 345–80.  Her insight and judgment were also deemed fair to good.  AR 345–80, 396–408.  Ms. Donovan was described as friendly, cooperative, and communicative.  AR 408.  In September 2012, Ms. Donovan reported that her mood was "happy" and "more stable."  AR 34, 396.  She described her energy, sleep, and motivation as fair, and was trying to stay physically active by swimming more.  *Id*.  The last mental status examination in the record showed that Ms. Donovan was alert, oriented, and displayed grossly intact cognitive functioning.  *Id*.  Ms. Donovan's final physician's record dated October 3, 2012, was negative for depressed mood and affect.  AR 416.

In reaching his determination that Ms. Donovan's mental impairments were non-severe, the ALJ discussed at length the Paragraph B Criteria in conjunction with the findings of consultative examiner, L.D. Larson, Ph.D, a licensed psychologist who completed a psychological evaluation of Ms. Donovan.  AR 33, 236–42.  After administering a series of cognitive tests, Dr. Larson opined that Ms. Donovan had sufficient general cognitive ability to understand, remember, and carry out an extensive variety of complex and detailed instructions, as well as simple one or two-step instructions.  AR 239–40.  Although her ability to interact with supervisors, coworkers, and the public might be impacted by her physical problems, Dr. Larsen opined that Ms. Donovan demonstrated adequate social skills.  AR 33, 240.  Further, Ms. Donovan demonstrated adequate concentration and attention sufficient to carry out specified

tasks, even though her concentration may be impacted at times by her physical concerns or pain medications.  AR 240.

After thoroughly reviewing Ms. Donovan's records, the ALJ found that the greater weight of the evidence showed Ms. Donovan suffered "no more than mild limitation" in activities of (i) daily living; (ii) social functioning; (iii) concentration, persistence, or pace; and (iv) no episodes of decompensation that have been of extended duration.  AR 32–34; *see also* AR 249–61 (Psychiatric Review Technique Form by Mark Richman, Ph.D., dated June 23, 2011), AR 321–34 (Psychiatric Review Technique Form by Susan Kotler, Ph.D., dated Dec. 21, 2011).  The ALJ therefore concluded that Ms. Donovan's mental impairments were non-severe.

To summarize his findings at step two, the ALJ found Ms. Donovan had five severe impairments: osteoporosis; polyarthritis; chronic pain syndrome; status post left foot injury; and status post rib fractures, AR 31–32, as well as three non-severe mental impairments: mood disorder, pain disorder, and depressive disorder.  AR 32.  Because Ms. Donovan had five severe medically-determinable impairments, the ALJ's analysis proceeded to the third step.

### C.    Step Three

Step three of the disability evaluation requires an ALJ to determine whether a claimant's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, which is commonly referred to as the "Listings."   20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.826.  If a claimant's impairment or combination of impairments meet or equal the criteria of the Listings and meet the duration requirement, 20 C.F.R. §§ 404.1509, 416.909, then an ALJ makes a finding of disability.  20 C.F.R. §§ 404.1520(h), 416.920(h).  If a claimant's impairment or combination of impairments does not meet or equal the criteria of the Listings or meet the duration requirement, then the analysis proceeds to the next step.

At step three in the Decision, the ALJ found that no treating or examining physician stated findings equivalent in severity to the criteria of any listed impairment.  AR 34–35.  Thus, the ALJ concluded that Ms. Donovan did not have an impairment or combination of impairments

1    that meet or medically equal one of the impairments described in the Listings.  *Id*.  Accordingly,

2    the ALJ's analysis continued to Ms. Donovan's residual functional capacity ("RFC").

3    **D.      Step Four – Ms. Donovan's RFC**

4           The fourth step of the disability evaluation requires an ALJ to determine whether a

5    claimant has the RFC to perform his past relevant work ("PRW").  20 C.F.R. §§ 404.1520(f),

6    416.920(f).  To answer this question, an ALJ must first determine a claimant's RFC.  20 C.F.R.

7    §§ 404.1520(e), 416.920(e).  RFC is a function-by-function assessment of a claimant's ability to

8    do physical and mental work-related activities on a sustained basis despite limitations from

9    impairments.  SSR 96-8p, 61 Fed. Reg. 34474 (July 2, 1996).  In making this finding, an ALJ

10   must consider all the relevant evidence such as symptoms and the extent to which they can be

11   reasonably be accepted as consistent with the objective medical evidence and other evidence.  20

12   C.F.R. §§ 404.1529, 416.929; SSR 96-4p, 61 Fed. Reg. 34488 (July 2, 1996); 96-7p, 61 Fed.

13   Reg. 34483 (July 2, 1996).  To the extent that statements about the intensity, persistence, or

14   functionally limiting effects of pain or other symptoms are not substantiated by objective

15   medical evidence, an ALJ must make a finding on the credibility of a claimant's statements

16   based on a consideration of the entire case record.  An ALJ must also consider opinion evidence

17   in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 61

18   Fed. Reg. 34489 (July 2, 1996); 96-5p, 61 Fed. Reg. 34471 (July 2, 1996); and 06-3p, 71 Fed.

19   Reg. 45593 (Aug. 9, 2006).

20          After considering the entire record, the ALJ concluded that Ms. Donovan had the RFC to

21   perform light work as defined in 20 C.F.R. § 404.1567(b), "except that due to the pain from her

22   impairments, she is occasionally able to climb ramps and stairs, balance, stoop, kneel, crouch

23   and crawl."  AR 35.  However, Ms. Donovan "is never to climb ladders, ropes or scaffolds, and

24   is to avoid work around heights and moving machinery."  *Id*.  In making this finding, the ALJ

25   "considered all symptoms and the extent to which these symptoms can reasonably be accepted as

26   consistent with the objective medical evidence and the other evidence."  *Id*.  He also considered

27   opinion evidence.  *Id*.  Although the ALJ found that Ms. Donovan's medically determinable

28   impairments could reasonably be expected to cause her alleged symptoms, he determined that

9

1    Ms. Donovan's statements concerning the intensity, persistence and limiting effects of those

2    symptoms were not credible to the extent they were inconsistent with the RFC Assessment.

3    AR 36, *see also* AR 80–87, 313–20 (Physical RFC Assessments).

4                    **1.      Ms. Donovan's Medical Symptoms**

5            Insofar as Ms. Donovan alleged symptoms and functional limitations that would preclude

6    her from performing the activities described in her RFC, the ALJ found that Ms. Donovan's

7    complaints were not supported by the objective findings of the medical record, inconsistent with

8    the medical opinion evidence, and not credible.  AR 35–39.  The ALJ determined that the greater

9    weight of the evidence showed that Ms. Donovan's overall treatment history had been "fairly

10   conservative, and that the medications have helped her symptoms."  AR 36.  Thus, the medical

11   evidence did not support Ms. Donovan's statements regarding the persistence or the degree of

12   limiting effect of her alleged chronic pain in her lower back, hips, legs, knees, feet, chest, and

13   hands.  *Id*.

14           In particular, the Decision notes that Ms. Donovan's medical records showed no specific

15   treatment directed towards her hands, despite her complaints of hand pain.  AR 36, 243–48.  Ms.

16   Donovan's treatment records also showed that she had been receiving care for existing foot pain

17   from April 2010 through June 2010, which was prior to her alleged onset date of September 19,

18   2010.  *Id*.  In December 2010, Ms. Donovan reported that she was doing "quite well," despite

19   tenderness in her foot, and her treatment plan remained conservative, recommending anti-

20   inflammatory medications and follow-up visits.  AR 36, 296.  Ms. Donovan attended multiple

21   follow-up visits in early 2011 and the corresponding medical records show that her providers

22   stayed with a conservative course of care.  AR 36, 286–95.  Likewise, medical records from

23   December 2011 through October 2012 show that Ms. Donovan was seen on a routine basis for

24   treatment and maintenance of her back, rib, and bilateral foot pain, osteoporosis, polyarthralgia,

25   and depression.  AR 37, 414–44.  Ms. Donovan's treatment plan did not change throughout this

26   time—her providers consistently recommended conservative treatments, including medications,

27   referral to physical therapy, diet and exercise, and follow-up visits.  *Id*.

28

In addition to Ms. Donovan's medical records, the ALJ considered the opinions of a consultative examiner and a state agency review physician.  The ALJ relied on the results of Ms. Donovan's comprehensive internal medicine evaluation with David Mumford, M.D.  AR 36–37, 243–48 (Consultative Exam Report).  Although Ms. Donovan claimed to have pain in her hands, hips, knees, and both feet, she reported to Dr. Mumford that her pain improved with medication and heat packs.  AR 243.  Dr. Mumford noted that Ms. Donovan entered the examining room without the help of a cane.  AR 244.[3]  Ms. Donovan's exam was "characterized by dramatic presentation" and "periodically she look[ed] afraid"; however, she was "able to get on and off the exam table independently and without difficulty."  *Id*.  Regarding Ms. Donovan's musculoskeletal system, the exam revealed no evidence of joint deformity or swelling and her range of motion was within normal limits for upper and lower extremities.  AR 245.  As to her mental status, Dr. Mumford found Ms. Donovan to be alert and oriented, with intact memory and recall.  *Id*.  The neurological portion of Ms. Donovan's exam showed normal cranial nerves, muscle tone and bulk, and 5/5 motor strength.  AR 246.  Functionally, Dr. Mumford opined that Ms. Donovan is capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently.  AR 247.  Dr. Mumford advised that she was able to walk or stand six hours in an eight-hour workday and had no restrictions on sitting.  *Id*.  The Decision summarizes Dr. Mumford's findings and conclusion that Ms. Donovan "had subjective complaints of neck and back pain with no objective evidence of any significant mechanical problems."  AR 37, 246.

The ALJ also considered the findings of the state agency review physician, Jon Arnow, M.D., who concluded that Ms. Donovan was capable of working at a light exertional level.  AR 38, 313–20 (Physical RFC Assessment dated Dec. 21, 2011); *see also* AR 80–87 (Physical RFC Assessment by Karen Ravenelle dated July 28, 2011).  Functionally, Dr. Arnow opined that Ms. Donovan is capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently.  AR 314.  In an eight-hour workday, Ms. Donovan was deemed capable of standing,

---

[3] Ms. Donovan's November 2010 medical records also note that, "despite having an antalgic gait," she "was not utilizing crutches and was not wearing any type of protective footwear."  AR 36, 297.

walking, or sitting for six hours.  *Id*.  She was also found occasionally capable of all postural activities, except for climbing ladders and scaffolds.  AR 315.  Dr. Arnow's findings were consistent with a Physical RFC Assessment completed by five months earlier.  AR 81–82.

After examining Ms. Donovan's medical treatment records, the ALJ opined that Ms. Donovan's "complaints relating to her lower, back, hips, legs, knees, feet, chest and hands are insufficient to support the allegation that she is unable to perform any work related activities."  AR 37.   In particular, the ALJ found Ms. Donovan's conservative treatment history was consistent with her "relatively normal physical examination findings."  *Id*. (citing AR 244–46, 294, 296).  The Decision further states that the opinions of Dr. Mumford and the state agency medical consultants are consistent with the objective medical evidence and the record as a whole, "demonstrating that the claimant's symptoms were controlled through conservative measures and that she was able to exercise and perform her daily activities."  AR 38 (citing AR 183–85, 238, 288–91, 298, 421–26, 429–39, 442–44).

### 2.    Ms. Donovan's Functional Limitations

In his determination regarding the degree of Ms. Donovan's functional limitation, the ALJ assessed the four broad categories found in paragraph B and C of the adult mental disorders listings and summarized in the Psychiatric Review Technique Form.  With regard to the fourth category, episodes of decompensation, the ALJ observed that Ms. Donovan has experienced no episodes of decompensation.  AR 32.  This finding was consistent with Ms. Donovan's medical records showing that she had never been psychiatrically hospitalized.  AR 33, 236.

As to the first three categories, the ALJ found that Ms. Donovan had "no more than mild limitation" in activities of daily living, social functioning, and concentration, persistence, or pace.  AR 32.  Ms. Donovan self-reported that she was able to perform a variety of activities of daily living, including eating, taking medications, bathing and dressing herself, and managing her finances, although she took breaks due to her pain.  AR 33, *see also* AR 170–79, 180–95 (Pl.'s Adult Function Reports), AR 236–42 (Psychological Evaluation by L.D. Larson, Ph.D).  She experienced sleep difficulties and needed help to complete household chores.  AR 173–75, 238.  However, she also reported that she was able to complete a wide variety of daily activities

without assistance, such as preparing frozen meals, washing dishes, doing laundry, grocery shopping, using public transportation, watching television, talking on the phone, and crocheting. *Id*.

The ALJ utilized a psychological evaluation of Ms. Donovan by L.D. Larson, Ph.D., a consultative examiner and licensed psychologist who assessed Ms. Donovan's functional limitations.   AR 33, 236–42.   Dr. Larson opined that Ms. Donovan had sufficient general cognitive ability to understand, remember, and carry out an extensive variety of complex and detailed instructions, as well as simple one or two-step instructions.  AR 239–40.  Dr. Larsen concluded that Ms. Donovan demonstrated adequate social skills, although her ability to interact with supervisors, coworkers, and the public might be impacted by her physical problems. AR 240.   Although Ms. Donovan's concentration may be impacted at times by her physical concerns or pain medications, Dr. Larson found that she demonstrated adequate concentration and attention sufficient to carry out specified tasks.  AR 240.

The ALJ also considered the findings of the state agency review psychologists who found that Ms. Donovan's affective disorder and somatoform disorder were non-severe and unsupported by objective medical evidence.  AR 249–61 (Psychiatric Review Technique Form by Mark Richman, Ph.D., dated June 23, 2011), AR 321–34 (Psychiatric Review Technique Form by Susan Kotler, Ph.D., dated Dec. 21, 2011).   Both Dr. Richman and Dr. Kotler concluded that Ms. Donovan had no functional limitations.  AR 259, 331.  Accordingly, the Decision indicates that Ms. Donovan lacked any functional limitation that would hinder her ability to perform light work.

### 3.    Ms. Donovan's Credibility

The ALJ found that Ms. Donovan's medical records and self-reported activities undermined her credibility and demonstrated exaggeration of symptoms.  AR 35–36.  Ms. Donovan alleged that she suffers from chronic pain in her lower, back, hips, legs, knees, feet, chest, and hands.  AR 36.  However, the ALJ concluded that "the medical evidence does not support her complaints of their persistence or the degree of their limiting effects" because her "treatment plan was no more than conservative, consisting of medications, follow up visits and

13

instructions on diet and exercise." AR 36–37.  He noted that the medical records reflected she had had foot pain and rib cage pain since before her alleged onset date, but was able to work with no evidence of significant exacerbation since her alleged onset date. Id at 37.

In addition, Ms. Donovan's self-reported daily activities were inconsistent with the alleged intensity of her pain.  Despite her complaints of debilitating pain, she was able to perform a variety of activities of daily living, including eating, taking medications, bathing and dressing herself, paying bills, managing her finances, preparing frozen meals, washing dishes, doing laundry, grocery shopping, using public transportation, watching television, talking on the phone, and crocheting.  AR 170–79, 180–95 (Pl.'s Adult Function Reports), AR 236–42 (Psychological Evaluation by L.D. Larson, Ph.D.).    The Decision also cites Ms. Donovan's August 2012 report that "she enjoys swimming and that she had a reduction in pain following exercise." AR 37 (citing AR 398).  These admissions contradicted Ms. Donovan's allegations and significantly questioned her credibility regarding the impact of her impairments on her activities of daily living.  Based on Ms. Donovan's self- reported daily activities, the multiple evaluations of her medical and mental impairments, the ALJ concluded that the totality of the evidence in the record did not support Ms. Donovan's allegations that she would be incapable of performing light work.  Id.  He also found that her conservative treatment history was consistent with relatively normal physical examination findings. Id.

Based on his function-by-function analysis of Ms. Donovan's physical and mental limitations throughout the Decision, the ALJ found that she had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), "except that due to the pain from her impairments, she is occasionally able to climb ramps and stairs, balance, stoop, kneel, crouch and crawl."  AR 35. However, Ms. Donovan "is never to climb ladders, ropes or scaffolds, and is to avoid work around heights and moving machinery."  Id.

In explaining how he reached this RFC determination, the ALJ noted the weight he afforded the multiple providers.[4]  The ALJ gave the opinions of examining physicians, Drs.

---

[4]  Ms. Donovan does not contest the weight afforded to her medical providers or examiners.

1   Mumford and Larson significant weight as they were consistent with the objective medical

2   record.  AR 38.  The opinions of the state agency review physicians and psychologist, Drs.

3   Arnow, Richman, and Kotler were given significant weight as non-examining experts because

4   their opinions were "consistent with the objective medical and mental health evidence."  *Id.*

5       The ALJ gave the opinion of Bernard T. Bartolome, M.D., Ms. Donovan's primary care

6   physician, "very little weight" because it was inconsistent and unsupported by the objective

7   evidence of record.  AR 38.  The Decision states multiple reasons for the discounted weight.  Dr.

8   Bartolome opined that her "chronic pain syndrome, fibromyalgia and depression would render

9   her unable to work for one year."  *Id.* (citing AR 463–64).  However, this conclusion was

10   inconsistent with Ms. Donovan's other medical source statements and treatment records

11   indicating that her "symptoms were controlled by conservative measures, she was able to

12   exercise and perform her daily activities."  *Id.*  Dr. Bartolome's conclusion also conflicted with

13   his statement that Ms. Donovan's "prognosis was fair and that her treatment plan required only

14   pain management."  *Id.* (citing AR 463–64).  The ALJ further noted that Dr. Bartolome's

15   "opinion was vague, offering no specific findings regarding the claimant's functional

16   limitations."  *Id.*  Lastly, the ALJ found that Dr. Bartolome's opinion "represents an issue

17   reserved for the Commissioner because it is a statement on the ultimate issue of disability.  *Id.*

18   (citing SSR 96-5p, 61 Fed. Reg. 34471 (July 2, 1996) (noting that the Secretary of Health and

19   Human Services has final responsibility for deciding certain issues, including whether an

20   individual is disabled under the Act).

21           **E.      Step Four – Ms. Donovan's Ability to Perform her PRW**

22       Once an ALJ has determined a claimant's RFC as an initial consideration at step four, an

23   ALJ utilizes the RFC assessment to determine whether a claimant can perform his PRW.  20

24   C.F.R. §§ 404.1520(f), 416.920(f).  PRW means work performed either as a claimant actually

25   performed it or as it is generally performed in the national economy within the last fifteen years

26   or fifteen years prior to the date that disability must be established.  In addition, the work must

27   have lasted long enough for a claimant to learn the job and to perform it as SGA.  20 C.F.R.

28

§§ 404.1560(b), 404.1565, 419.960(b), 416.965.  If a claimant has the RFC to perform his or her

past work, then an ALJ makes a finding that a claimant is not disabled.

At step four in the Decision, the ALJ concluded that Ms. Donovan was capable of performing her PRW as a customer service representative and program specialist because such work does not require the performance of work-related activities precluded by her RFC.  AR 39. During the Hearing, a vocational expert testified that Ms. Donovan held three positions in her PRW: (i) shipping and receiving clerk, which is medium, skilled work with a specific vocational profile ("SVP") of 5; (ii) customer service representative, which is light, skilled work with an SVP of 6; and (iii) program specialist, which is sedentary, skilled work with an SVP of 6.[5]  *Id*. The vocational expert testified that there were no discrepancies between Ms. Donovan's testimony and the Dictionary of Occupational Titles.  *Id*.  After comparing Ms. Donovan's RFC with the physical and mental demands of her PRW, the ALJ found that she was able to perform her PRW as a customer service representative and program specialist as it is customarily performed in the national economy.  *Id*.  As a result, the Decision indicates that Ms. Donovan is not disabled.

### F.      Step Five

Step five of the disability evaluation requires an ALJ to determine whether a claimant is able to do any other work considering her RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g), 416.920(g).  If she can do other work, then an ALJ makes a finding that a claimant is not disabled.  Although a claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Commissioner.  The Commissioner is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do. *Yuckert*, 482 U.S. at 141–42; *see also Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012) (citing 42 U.S.C. § 423(d)(2)(A)).

---

[5]  The Dictionary of Occupational Titles (DOT) describes Ms. Donovan's PRW positions at the following citations: (i) shipping and receiving clerk, No. 222.387-050, (ii) customer service representative, No. 205.362-026, and (iii) program specialist, No. 166.167-050.  AR 39.

Because the ALJ found that Ms. Donovan is able to perform her PRW, the ALJ further determined that she was not disabled from September 19, 2010, through the date of the Decision. AR 39.  As such, there was no need for the ALJ's analysis to proceed to the fifth step.

III.    THE PARTIES' POSITIONS ON APPEAL

    A.    Ms. Donovan's Motion for Reversal and/or Remand (Dkt. #18)

Ms. Donovan seeks reversal and remand of the ALJ's decision on the grounds that the ALJ failed to articulate clear and convincing reasons for finding that Ms. Donovan was not credible.  Pl.'s Mot. at 5–6.  Citing SSR 12-2p, 77 Fed. Reg. 43640 (July 25, 2012), which addresses the SSA's evaluation of fibromyalgia, Ms. Donovan contends that the ALJ committed error by finding that her chronic pain was not supported by objective medical evidence.  *Id*. at 6–9.  Although the ALJ discounted Ms. Donovan's complaints as disproportionate to the objective medical record, Ms. Donovan contends that the ALJ's use of "boilerplate language does not amount to a clear and convincing reason to reject Ms. Donovan's testimony."  *Id*. at 8:11–12.  Specifically, Ms. Donovan asserts that the "ALJ's credibility determination is indicative of an extreme lack of medical understanding of the debilitating effect of fibromyalgia."  *Id*. at 9:2–4.  Ms. Donovan further argues that her ability to perform limited activities of daily living and to swim and exercise was not a clear and convincing reason to discount her complaints.  *Id*. at 9–10.  The ability to perform various activities of daily living was not inconsistent with Ms. Donovan's subjective complaints of pain.  *Id*. at 10.  Because the ALJ's credibility analysis improperly discredited Ms. Donovan's testimony, she requests that the Court reverse the Decision and/or remand for further proceedings.[6]

    B.    The Commissioner's Opposition and Cross-Motion to Affirm (Dkt. #19, #20)

The Commissioner seeks affirmance of the ALJ's Decision asserting that the ALJ properly assessed Ms. Donovan's credibility and determined that Ms. Donovan's is not disabled under the Act.  Opp'n & Cross-Mot. (Dkt. #19, #20).  The Commissioner argues that the ALJ properly assessed Ms. Donovan's credibility because the Decision provides specific, permissible

[6] Ms. Donovan did not file a reply brief and the time for doing so has now passed.

17

reasons for finding Ms. Donovan's testimony less than credible. *Id*. at 4. For example, "Ms. Donovan's treatment history, including her noncompliance with treatment, the conservative nature of the treatment she did receive, and the efficacy of such conservative treatment undermined her claims of disabling pain." *Id*. at 4:17–5:3. The Commissioner also asserts the ALJ properly found that Ms. Donovan's activities of daily living, such as doing laundry, going shopping, using public transportation, preparing simple meals, attending to her personal care and hygiene, undermined the veracity of her claims. *Id*. at 7. Thus, the Decision included sufficient details to ensure that the ALJ did not arbitrarily discredit Ms. Donovan's testimony. The Commissioner also points out, "[t]o the extent that Ms. Donovan claims that a claimant does not need to present evidence that she has fibromyalgia in order to qualify for benefits under the Act, she is incorrect." *Id*. at 8:5–9 (citing 20 C.F.R. §§ 404.1520, 416.920; SSR 12-2p). The Commissioner further asserts that Ms. Donovan's Motion fails to "articulate any fibromyalgia-related limitations that the ALJ did not consider and/or that precluded all work." *Id*. at 8:13–15. Because Ms. Donovan fails to demonstrate any error in the ALJ's credibility analysis, the Commissioner requests that Ms. Donovan's request for reversal and/or remand be denied.

## ANALYSIS AND FINDINGS

Reviewing the record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion, the Court finds the ALJ's decision is supported by substantial evidence, and the ALJ did not commit legal error.

I. **THE ALJ DID NOT ERR IN FINDING THAT MS. DONOVAN'S FIBROMYALGIA DIAGNOSIS WAS NOT MEDICALLY DETERMINABLE**

The sole issue raised on appeal in this case is whether the ALJ failed to provide clear and convincing reasons for discrediting Ms. Donovan's testimony of debilitating pain that precluded her from engaging in any substantial gainful activity. Ms. Donovan argues that although the ALJ confirmed the methodology for addressing disability claims based on fibromyalgia, he impermissibly rejected her pain and limitation testimony, and that chronic pain from fibromyalgia prevents her from engaging in substantive gainful activity.

Neither side addressed what fibromyalgia is or how it is diagnosed in their briefs. Fibromyalgia is a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue. *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004) (citing *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Tech, Inc.*, 125 F.3d 794, 796 (9th Cir. 1997)).   Common symptoms of fibromyalgia include "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease." *Benecke*, 379 F.3d at 589–90 (citation omitted).   Given the nature of these symptoms, a claimant's "report of complaints, or history, is an essential diagnostic tool" in fibromyalgia cases. *Green–Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (citation omitted).

SSR 12-2p, 77 Fed. Reg. 143, 43640 (July 25, 2012), specifically addresses the evidence the SSA evaluates when a claimant seeks disability benefits due to fibromyalgia.   Although SSR 12-2p acknowledges that fibromyalgia is "a complex medical condition," it also notes:

> As with any claim for disability benefits, before we find that a person with an [medically determinable impairment (MDI)]  of [fibromyalgia] is disabled, we must ensure there is *sufficient objective evidence* to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity.

*Id*. (emphasis added).   The American College of Rheumatology ("ACR") has issued two sets of diagnostic criteria to aid physicians in diagnosing fibromyalgia: (i) the 1990 ACR Criteria for the Classification of Fibromyalgia, *see Benecke*, 379 F.3d at 590 (citing *Jordan v. Northrop Grumman Corp.*, 370 F.3d 869, 872 (9th Cir. 2004)), and (ii) the 2010 ACR Preliminary Diagnostic Criteria, *see* SSR 12-2p.   The SSA utilizes both sets of criteria in evaluating disability claims based on fibromyalgia.   *See* SSR 12-2p.

Physicians diagnose the fibromyalgia "entirely on the basis of patients' reports of pain and other symptoms." *Benecke*, 379 F.3d at 590.   Based on the 1990 ACR criteria, the generally accepted diagnostic test requires that a patient report pain in at least 11 of 18 tender points when palpitated by the examining physician's thumb. *Jordan*, 370 F.3d at 872; *Rollins v. Massanari*, 261 F.3d 853, 855 (9th Cir. 2001).   Although there are no laboratory tests to confirm a fibromyalgia diagnosis, *Benecke*, 379 F.3d at 590, physicians must administer objective tests to

rule out other diseases and alternative explanations for the pain. *Jordan*, 370 F.3d at 877. *See also* SSR 12-2p (noting that, in fibromyalgia cases, is common to find "evidence of examinations and testing that rule out other disorders that could account for a person's symptoms," including "imaging and laboratory tests such as complete blood counts, erythrocyte sedimentation rate, antinuclear antibody, thyroid function, and rheumatoid factor"). Both the 1990 and 2010 ACR criteria require evidence that physicians excluded other disorders. *Id.* Other physical and mental disorders may have symptoms or signs similar to or the same as fibromyalgia, including rheumatologic disorders, myofacial pain syndrome, polymyalgia, rheumatica, chronic Lyme disease, and cervical hyperextension-associated or hyperflexionassociated disorders. *Id.* at n.7.

In this case, the ALJ did not err in finding that Ms. Donovan's fibromyalgia diagnosis was not medically determinable. After considering the medical evidence of record, the ALJ concluded the following:

> The claimant alleged at her hearing that she has been diagnosed with fibromyalgia; however, as will be fully discussed below, this impairment is not medically determinable, as the records show no objective diagnosis for fibromyalgia. [AR 421.] Despite notations referencing fibromyalgia, it appears that such were primarily based upon the claimant's self reports.

AR 32. Ms. Donovan attempts to characterize this finding as an adverse credibility determination. It is not.

Even if the ALJ had fully credited Ms. Donovan's self reports of pain, the lack of medical records to support her subjective reports of pain precluded a finding that fibromyalgia was a medically determinable impairment. Ms. Donovan's medical records contain scant reference to fibromyalgia, much less objective medical tests that support a diagnosis. During the hearing on November 6, 2012, Ms. Donovan's counsel informed the ALJ that Dr. Bartolome had recently diagnosed her with fibromyalgia. AR 63, 70. The fibromyalgia diagnosis occurs on a Clark County Social Service Assessment form filled out July 19, 2012 by Dr. Bartolome. AR 463   The treatment notes for a visit with Dr. Bartolome the same day indicate her chief complaint was "frequent fall/refill/constipation" AR 427. She also complained of low back and leg pain. *Id.* A note on the record reads "+trigger points for FMG" AR 428. There are no records indicating  the diagnostic criteria were met with respect to the number of trigger point

noted during the exam or that any tests had been performed to rule out other conditions.  In fact, Ms. Donovan's counsel confirmed during the hearing that Ms. Donovan "doesn't have a tender point exam, but is taking Savella for the fibromyalgia."  AR 63.

The July 19, 2012 assessment form Dr. Bartolome completed a check-the-box form, which merely states that Ms. Donovan's diagnosis is "chronic pain syndrome/fibromyalgia/depression."  AR 463.  As the ALJ correctly pointed, out Dr. Bartolome also wrote her prognosis was "fair."  *Id.*  The ALJ found that his conclusory, unexplained diagnosis and statement that Ms. Donovan was "physically and mentally" unable to work for a year was inconsistent with his "fair" diagnosis.  In August and September 2012, Ms. Donovan's mental health service providers quoted her as saying that her primary care physician diagnosed her with fibromyalgia, but they do not provide any further detail.  *See* AR 396–98.  Ms. Donovan's reports to her mental health providers are not medical records supporting a fibromyalgia diagnosis.

Counsel told the ALJ that Ms. Donovan did "not have the ability to obtain full narratives" but Dr. Bartolome confirmed Ms. Donovan's inability to work in two exhibits.  AR 62 (citing AR 463–64).  Counsel noted that Dr. Bartolome filled out a barely legible hand-written statement on a prescription pad, *id.*,[7] dated November 30, 2011 which stated that Ms. Donovan "is not able to work for 1 year due to – chronic foot pain – depression – chronic pain syndrome – [illegible] gait."  AR 464.  Months later, in July 2012, Dr. Bartolome completed a medical/service provider assess form indicating an unexplained diagnosis of fibromyalgia.  The form specifically requests the reason for the specific limitation but none is provided.  *Id.*  There is ample support in the record for the ALJ's finding that Dr. Bartolome's "opinion was vague, offering no specific findings regarding the claimant's functional limitations."  AR 38 (citing AR 463–64).

Although a patient's reports of pain are an "essential diagnostic tool" for a fibromyalgia diagnosis, *Green–Younger*, 335 F.3d at 107, it cannot be the *only* evidence supporting a diagnosis.  The ACR criteria and SSA regulations still require physicians to conduct a tender

---

[7]  The Court notes that "VOID" is printed repeatedly across Dr. Bartolome's statement.  This abnormality is not addressed in the Decision or the parties' briefing.

point exam and perform imaging and laboratory tests to rule out other disorders.  Nothing in the record shows that Dr. Bartolome (or any other treating physician) applied the diagnostic criteria. .  The ALJ did not err in his determination that Ms. Donovan's fibromyalgia was not a medically determinable impairment.[8]

## II.   THE ALJ PROPERLY EVALUATED MS. DONOVAN'S CREDIBILITY

In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis.  *Molina*, 674 F.3d at 1112 (citing *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)).  First, the ALJ must determine whether there is objective medical evidence of an impairment which could reasonably produce the pain or other symptoms alleged.  *Id.*  In this first step, a claimant need only show that her impairment could reasonably have caused *some degree* of the symptom she has alleged.  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)).  A claimant is not required to (i) show that the impairment could reasonably be expected to cause the severity of the symptom, or (ii) produce objective medical evidence of the pain or fatigue, or the severity thereof.  *Id.*  Second, if objective medical evidence exists, and there is no evidence of malingering, the ALJ must give "specific, clear and convincing reasons" for rejecting the claimant's testimony about the severity of her symptoms.  *Garrison*, 759 F.3d at 1014–15 (quoting *Smolen*, 80 F.3d at 1281).  Although the Ninth Circuit has recognized that this is not an easy requirement to meet, *id.* at 1012, "the ALJ is not required to believe every allegation of disabling pain," otherwise disability benefits "would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  *Molina*, 674 F.3d at 1112 (citation omitted).

In evaluating a claimant's testimony, the ALJ may use "ordinary techniques of credibility evaluation."  *Id.* (quoting *Turner v. Comm'r of Social Sec.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010)).  For example, an ALJ may consider factors such as: (i) inconsistencies either in the

---

[8]   The Court also notes that Ms. Donovan did not attempt to supplement the administrative record with new medical evidence of her fibromyalgia diagnosis, despite having the opportunity to do so on appeal in her Motion to Remand.  *See* Scheduling Order (Dkt. #13).

1   claimant's testimony or between the testimony and the claimant's conduct; (ii) unexplained or

2   inadequately explained failure to seek treatment or to follow a prescribed course of treatment;

3   (iii) whether the claimant engages in daily activities inconsistent with the alleged symptoms; (iv)

4   the observations of treating and examining physicians and other third parties regarding the

5   claimant's symptoms; (v) functional restrictions caused by the symptoms; and (vi) the claimant's

6   daily activities. *Id.* (citation omitted); *Rounds v. Comm'r Soc. Sec. Admin.*, 795 F.3d 1177, 1186

7   (9th Cir. 2015) (quoting *Smolen*, 80 F.3d at 1284). The ALJ must specify "which symptom

8   testimony is not credible and what facts in the record lead to that conclusion." *Id.*

9        Ms. Donovan's Motion (Dkt. #18) does not identify what specific testimony the ALJ

10  found was not fully credible to the extent is was inconsistent with her RFC determination.

11  Rather, Ms. Donovan argues that the ALJ's credibility determination "is indicative of an extreme

12  lack of understanding of the disabling effect of fibromyalgia." Pl.'s Mot. (Dkt. #18) at 9:2–4.

13  The court finds, the ALJ's credibility findings are supported by substantial evidence because the

14  Decision articulates specific reasons for determining that Ms. Donovan's testimony was not

15  credible.

16       For example, the ALJ found that Ms. Donovan's self-reported activities in her Adult

17  Function Reports undermined her credibility and demonstrated exaggeration of symptoms.

18  AR 35–37. She was able to perform a variety of activities of daily living, including eating,

19  taking medications, bathing and dressing herself, paying bills, managing her finances, preparing

20  frozen meals, washing dishes, doing laundry, grocery shopping, using public transportation,

21  watching television, talking on the phone, and crocheting, despite her complaints of debilitating

22  pain. AR 170–79, 180–95 (Pl.'s Adult Function Reports), AR 236–42 (Psychological Evaluation

23  by L.D. Larson, Ph.D.). The ALJ correctly noted that although she suffered foot and rib cage

24  pain prior to her alleged date of onset she was able to work with no evidence of significant

25  exacerbation since her alleged onset date. AR 37. In her psychological evaluation on May 23,

26  2011 Ms. Donovan reported she last worked in 2010 in a temporary job a couple of days a week

27  and before that had worked for UPS for four years in customer service. AR 237. She told Dr.

28  Larsen that she "had physical problems while working at UPS, but she also had to take care of

23

her elderly mother, and she stopped working". *Id*.  The Decision also cites Ms. Donovan's August 2012 report that "she enjoys swimming and that she had a reduction in pain following exercise." AR 37 (citing AR 398).

The Decision points out a number of inconsistencies in Ms. Donovan's medical records to support the adverse credibility finding.  For example, Ms. Donovan alleged that she suffers from chronic pain in her lower, back, hips, legs, knees, feet, chest, and hands.  AR 36.  However, "the medical evidence does not support her complaints of their persistence or the degree of their limiting effects" because her "treatment plan was no more than conservative, consisting of medications, follow up visits and instructions on diet and exercise."  AR 36–37. The specific records he relied on for this finding were identified. In addition to her admitted activities of daily living that undermined her reports of debilitating pain, the ALJ relied on Ms. Donovan's treatment history, including the conservative nature of her treatment, the efficacy of such conservative treatment, and her occasional noncompliance with treatment to support the adverse credibility finding.  *Id*.

Multiple references in the record support his findings that Ms. Donovan's depression was related to situational stressors and improved with treatment.  *See, e.g*., AR 236 (reports "I'm happy; seeing my son today," trying to keep more physically active, swimming more; history of depression since age 26 after divorce, treated for depression since age 29); AR 398 (reports she was really depressed a couple of times, sleeping well with Ambien, gets 8-9 hours nightly, energy levels and motivation fair, enjoys swimming, claims reduction in pain following exercise); AR 400 (reports "been alright", mood more stable, Cymbalta has helped with chronic pain, gets 8-9 hours of sleep nightly, enjoys swimming with niece).

The ALJ's findings are supported by the conclusions of examining and review physicians, Drs. Mumford, Arnow, Larson, Richmond, and Kotler.  Dr. Mumford and Dr. Arnow opined that Ms. Donovan would be able to lift and/or carry 20 pounds occasionally, and 10 pounds frequently, stand and/or walk six hours in an eight-hour workday, could sit for eight hours in an eight-hour workday, and perform all postural maneuvers occasionally, except for climbing ladders and scaffolds.  *See* AR 247, 315.  Dr. Arnow concluded that Ms. Donovan was

capable of working at a light exertional level.  AR 38, 313–20 (Physical RFC Assessment dated Dec. 21, 2011); *see also* AR 80–87 (Physical RFC Assessment by Karen Ravenelle dated July 28, 2011).  These medical opinions were consistent with the psychological opinions by Drs. Larsen, Richman, and Kotler reporting that Ms. Donovan had no functional limitations that would hinder her ability to perform light work.  *See, e.g.*, AR 239–40, 259, 331.

It is the ALJ's responsibility to resolve conflicts in Ms. Donovan's medical records.  The ALJ's credibility finding was based on Ms. Donovan's daily activities and limitations, the multiple evaluations of her medical and mental impairments, and her treatment history.  The ALJ comprehensively discussed the medical records he relied upon to make his findings.  The Court has carefully reviewed the record and finds that the records cited in the Decision support the ALJ's conclusions.  The ALJ permissibly concluded that the totality of the evidence in the record did not support Ms. Donovan's testimony she was incapable of performing light work.  The ALJ's adverse credibility determination was supported by specific, clear, and convincing reasons, and the Court must uphold it.

## CONCLUSION

Judicial review of a decision to deny disability benefits is limited to determining whether the decision is based on substantial evidence reviewing the administrative record as a whole.  It is the ALJ's responsibility to make findings of fact, draw reasonable inferences from the record as a whole, and resolve conflicts in the evidence and differences of opinion.  Having reviewed the Administrative Record as a whole, and weighing the evidence that supports and detracts from the Commissioner's conclusion, the Court finds that the ALJ's decision is supported by substantial evidence under 42 U.S.C. § 405(g).

For all of the foregoing reasons,

**IT IS RECOMMENDED:**

1.      Plaintiff Thora D. Donovan's Motion to Reverse/Remand (Dkt. #18) be DENIED.

2.      The Commissioner's Cross-Motion to Affirm (Dkt. #19) be GRANTED.

/ / /

/ / /

1   3.      The Clerk of Court be instructed to enter judgment accordingly and close this

2   case.

3   Dated this 20th day of January, 2016.

4

5                                                   PEGGY A. LEEN
6                                                   UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28